# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:07CV372-H

| | |
|---|---|
| **ANGELINE D. HOPPER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **MEMORANDUM AND ORDER** |
| ) | |
| **J.C. PENNEY CORPORATION, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Partial Summary Judgment [including brief and exhibits]" (document #20) filed July 14, 2008; and the Defendant's "Response [including exhibits] ..." (document #24) filed September 30, 2008.

On October 14, 2008, the Plaintiff filed her "Reply ..." (document #25).

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and this Motion is now ripe for disposition.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will grant the Plaintiff's Motion for Partial Summary Judgment, as discussed below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This is a negligence action filed in federal court pursuant to diversity subject matter jurisdiction. The Plaintiff, Angeline D. Hopper, is an African-American female who resides in Shelby, North Carolina. The Defendant, J.C. Penney Corporation, Inc., is a Delaware corporation with its principal place of business in Plano, Texas. The Defendant operates department stores,

including a store located at 246 North New Hope Road in Gastonia, North Carolina ("the store"). Among other services offered at the store, the Defendant operates a hair salon.

Taking the facts in the light most favorable to the Defendant, in May 2005, the Plaintiff began receiving hair styling services from Ashley Vermillion, a cosmetologist employed by the Defendant at the store's hair salon. Ms. Vermillion was one of two hair stylists at the salon who served primarily an African-American clientele. Ms. Vermillion testified at her deposition that she had "picked up" on styling and relaxing (straightening) African-American hair while in cosmetology school.

The Plaintiff testified at her deposition, and the Defendant does not dispute, that from May through November 11, 2005, the Plaintiff received hair styling services only at the Defendant's store. The Defendant maintains a Service Record for each of its customers, and the Service Record for the Plaintiff shows that for the same time period, Ms. Vermillion was the only stylist the Plaintiff used.

At the time the Plaintiff began seeing Ms. Vermillion, she had been using a hair product called Mizani to relax her hair, and Ms. Vermillion used that same product on the Plaintiff up until November 11, 2005, when Ms. Vermillion applied a product called 2 Steps 2 Straight, a product the Plaintiff had not previously used. Mizani is a sodium hydroxide-based "relaxer," while 2 Steps 2 Straight is an ammonium thioglycolate ("THIO")-based "straightener." Ms. Vermillion, as well as the Plaintiff's dermatological experts, Dr. Gary Slaughter and Dr. Wesley Wilborn, agree that treating a person's hair with both chemicals can damage the hair shaft, causing it to break.

It is also undisputed that the use of a relaxer, like Mizani, alone can cause some hair breakage. In the light most favorable to the Defendant, at the time the Plaintiff began receiving hair

2

treatments from Ms. Vermillion and through November 11, 2005, when Ms. Vermillion applied 2 Steps 2 Straight, the Plaintiff suffered some hair breakage, including breakage of some hair on the crown of her head two to four inches from the scalp. Ms. Vermillion testified that prior to November 11, 2005, she trimmed the hair on the crown of the Plaintiff's head to four inches to keep that hair an even length.

The Service Record shows that on September 19, 2005, Ms. Vermillion applied Mizani to the Plaintiff's hair and that she applied a color treatment on October 6, 2005.

When the Plaintiff returned for another relaxer treatment on November 11, 2005, Ms. Vermillion discussed the Plaintiff's hair with Candy (last name unknown), the other stylist in the salon who principally styled the hair of African-American customers, who recommended using a straightener, 2 Steps 2 Straight, instead of a relaxer. Ms. Vermillion testified that at that time, she had only used 2 Steps 2 Straight once, approximately two years earlier, that she did not then know that the product was based on ammonium thioglycolate, but that she was generally aware that products containing that chemical could not be used on hair that had been previously treated with a sodium hydroxide-based relaxer.

Ms. Vermillion also acknowledged that the package for the 2 Steps 2 Straight product that she applied to the Plaintiff's hair contained an express warning that the product contained ammonium thioglycolate and could not be used on hair that previously had been treated with a relaxer and admitted that she did not read those instructions and warnings until after the Plaintiff complained of hair loss the following week. Ms. Vermillion admitted that sometime after the Plaintiff complained of hair loss, Ms. Vermillion told Candy that she had improperly treated

3

Plaintiff's relaxed hair in contravention of the instructions that came with the 2 Steps 2 Straight product.

Upon examination by defense counsel, Ms. Vermillion testified that despite not having read the 2 Steps 2 Straight instructions and warnings, she nevertheless had only applied the straightener to the Plaintiff's new hair growth, that is, the portion of each hair that had grown since the Plaintiff's last relaxer treatment on September 19, 2005. But Ms. Vermillion admitted that even though she attempted to separate the chemical applications on the Plaintiff's hair, it was possible that the chemicals had "overlap[ped]."

The Plaintiff testified that the next day, November 12, 2005, her hair began to break dramatically and continued to do so over the next week, mainly in the crown of her head, but also in other places, leaving her looking "like a cancer patient." About November 19, 2005, the Plaintiff called the salon and asked for an appointment with Ms. Vermillion, who was unavailable, so the Plaintiff asked if she could see someone else. The salon manager, Roberta Mason, assigned the Plaintiff to see stylist Jamika Ford, which she did on November 19, 2005. In her Affidavit, Ms. Ford described the Plaintiff's appearance as "one of the worst hair experiences I have ever seen in a salon. The hair on the top of her head was shedding and breaking, almost completely bald. . . . she looked like a clown."

The Plaintiff testified and Ms. Ford avers that Ms. Mason spoke with Ms. Vermillion about the Plaintiff's situation, reviewed her Service Record, and read the instructions and warnings on the 2 Steps 2 Straight box. Ms. Mason then offered to treat the Plaintiff's hair and Ms. Ford shampooed and conditioned what hair the Plaintiff still had. Ms. Ford also told the Plaintiff that her hair loss was caused by the combination of the Mizani and the 2 Steps 2 Straight.

4

On November 26, 2005, the Plaintiff returned to the salon to have Ms. Ford attempt to sew a "weave" of hair into her own hair to cover the bald areas. Ms. Ford avers that the weave was unsuccessful because the Plaintiff's hair loss was too great and that her remaining hair was continuing to break. Ms. Ford recommended that the Plaintiff wear a wig until her hair grew back. The same day, Ms. Mason made a handwritten entry into the Service Record that the Plaintiff's hair "[d]id not tolerate 'THIO,'" that is, the ammonium thioglycolate in 2 Steps 2 Straight.

On November 30, 2005, and based on the recommendation of a friend who was a retired hairdresser, the Plaintiff saw Dr. Gary Slaughter, a dermatologist. Dr. Slaughter testified at his deposition that the Plaintiff was very angry at the Defendant over her hair loss, but that because the Plaintiff could not tell him at that time what chemicals had been applied to her hair, he was unable to conclude that the 2 Steps 2 Straight treatment had caused her hair loss. Dr. Slaughter also testified that although the Plaintiff told him that she had good hair growth prior to the 2 Steps 2 Straight treatment, because he had not seen her hair prior to the treatment, he was hampered in his ability to diagnosis the cause of what was considerable hair loss at the time he saw the Plaintiff. Accordingly, Dr. Slaughter initially diagnosed folliculitis (damage to the hair follicles) and alopecia (a generalized diagnosis of chronic hair loss) which could have any of several causes, including "topical applications of something."

On December 8, 2005, the Plaintiff went to Atlanta for a second opinion, to dermatologist Wesley Wilborn, who once had treated her daughter's skin condition. The Plaintiff testified that she brought the product information to Dr. Wilborn; that Dr. Wilborn explained that the relaxer chemical in Mizani should not be combined with the straightener chemical in 2 Steps 2 Straight; that her scalp was not damaged; that her hair would grow back; and that she did not have chronic alopecia.

Subsequently, the Plaintiff purchased several wigs and wore them until June or July 2006, at which time her hair had grown back sufficiently to stop wearing them.

On April 30, 2007, the Plaintiff filed her Complaint in the Superior Court of Gaston County, North Carolina, alleging a single claim of negligence against the Defendant. On August 10, 2007, and in response to the Defendant's "Request for Monetary Relief Sought," the Plaintiff served its "Statement of Monetary Relief Sought" indicating that she seeks damages in excess of $160,000.

On September 4, 2007, the Defendant removed the state court case to federal court, citing the existence of federal diversity subject matter jurisdiction. Said removal has not been challenged and appears proper.

At his deposition, taken on May 29, 2008, when the composition and timing of the subject hair treatments were known and the Plaintiff's hair had re-grown, Dr. Slaughter testified that hair treated with sodium hydroxide (the base ingredient in Mizani) was easily damaged when also treated with ammonium thioglycolate, specifically that such a combination of treatments "fractionate[s] the cuticle ... cause[s] disruptive damage to the follicle itself." According to Dr. Slaughter, folliculitis, his primary diagnosis, would also be seen as an acute manifestation of that chemical reaction that would heal. When then asked if the focal hair loss pattern he had observed on Plaintiff – on the crown and some other spots on the sides – was consistent with the consequence of a stylist putting ammonium thioglycolate on Plaintiff's hair after it had been treated with sodium hydroxide, he testified, "Yes. If what you are saying indeed happened, every dermatologist knows – well, I wouldn't say every – but it's very familiar and very written about in the field of dermatology." He added that the risk of mixing these two chemicals was "pretty common knowledge."

Dr. Slaughter further testified that the fact that the Plaintiff's hair grew back in six months was "very significant" clinically in establishing that the Plaintiff did not have chronic hair loss but, rather, had suffered a temporary reaction to a topical solution. Finally, Dr. Slaughter dismissed two alternate theories raised by the Defendant: that the Plaintiff's hair loss was a result of synthetic thyroid treatments that the Plaintiff began taking more than ten years earlier or was a result of the Plaintiff becoming anemic (which she was), neither of which would have caused the pattern of hair loss the Plaintiff temporarily suffered.

On May 30, 2008, Dr. Wilborn was deposed. Dr. Wilborn testified and his curriculum vitae supports that he has researched, lectured concerning, and developed hair products for African-American women since the mid-1970's. Dr. Wilborn testified that when he initially saw the Plaintiff, she told him that her hair had been previously relaxed with sodium hydroxide, later had been treated with ammonium thioglycolate, and then had begun to break. Dr. Wilborn explained that he examined the Plaintiff's hair by a "pull test" (passing his hand through her hair and pulling on it) and found it was breaking off. The parietal area (top) of her head had suffered the most hair loss, but was not completely bald. Dr. Wilborn did not perform a biopsy of the Plaintiff's scalp because it was "obvious" her hair was breaking on the shaft rather than falling from the root due to follicle damage, so a biopsy would only have caused unnecessary discomfort. Dr. Wilborn explained that he had been treating scalp damage for over 20 years and that the Plaintiff did not have scalp damage. When Dr. Wilborn examined the Plaintiff's scalp with a dermatoscope, he counted a "normal" number of hairs emerging from the skin.

Dr. Wilborn testified that he saw the Plaintiff a second time in February 2008 and found that her hair was not breaking and that her scalp was healthy, which he opined was further evidence that

7

her condition in December 2005 was caused by the application of ammonium thioglycolate to hair that had previously been treated with sodium hydroxide.

Like Dr. Slaughter, Dr. Wilborn also dismissed the idea that the Plaintiff's hair loss was from her thyroid condition or her anemia. He explained that both conditions cause the body to shed hair – if at all – at the root rather than break off in the shaft. He testified, "[t]here was no evidence of hair loss from the scalp, only from hair that had already emerged from the scalp that broke off."

On July 14, 2008, the Plaintiff filed her Motion for Partial Summary Judgment as to liability.

In its Response, the Defendant mounts essentially a two-prong defense. The Defendant maintains that Ms. Vermillion's testimony that she applied the 2 Steps 2 Straight only to new hair growth, despite her earlier testimony that she acknowledged her mistake to her co-worker, Candy, and Dr. Slaughter's initial diagnosis of folliculitis and alopecia, rather than a diagnosis of a condition singularly caused by the hair treatments, are sufficient to raise an issue of material fact.

The Plaintiff's Motion has been fully briefed and is, therefore, ripe for disposition.

## II. DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." See also Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

As a general principle, "[t]o make out an actionable claim for negligence, the plaintiff must introduce evidence tending to show that (1) defendant failed to exercise proper care in the performance of a duty owed to plaintiff; (2) the negligent breach of that duty was a proximate cause of plaintiffs injury; and (3) a person of ordinary prudence should have foreseen that plaintiffs injury was probable under the circumstances as they existed." Rose v. Steen Cleaning. Inc., 104 N.C.App. 539, 541, 410 S.E.2d 221, 222 (1991). See also Camalier v. Jeffries. 340 N.C. 699, 706, 460 S.E.2d 133,136 (1995).

In Johnson v. Lamb, 273 N.C. 701, 708, 161 S.E.2d 131, 138 (1968), the North Carolina Supreme Court stated the elements of a negligence claim brought against a cosmetologist alleged to have caused injury to a customer during the course of treatment:

> She must possess the degree of professional learning, skill and ability which other similarly situated ordinarily possess; She must exercise reasonable care and diligence

9

in the application of her knowledge and skill to her client's case; and She must use her best judgment in the treatment of her client.

Accord Lang v. Federated Dept. Stores, 161 Ga. App. 760, 762, 287 S.E.2d 729, 731 (1982) (beauticians must use reasonable care and common sense in applying a product); and Cowhig v. Cafarelli, 318 Mass. 632, 634, 63 N.E.2d 347, 348 (1945) (hair stylist must exercise the ordinary skill and ability of persons engaged in the hairdressing business in that locality).

Applying these legal principles to the facts taken in the light most favorable to the Defendant, the Plaintiff is entitled to summary judgment on the issue of liability. At the outset, the undersigned finds that even giving the Defendant the benefit of every reasonable inference from the record, it is clear that Ms. Vermillion applied an ammonium thioglycolate-based product to the Plaintiff's hair after it had been relaxed with a sodium hydroxide-based product. Although Ms. Vermillion attempted to ameliorate the effect of her mistake by testifying that she added the straightener only to new hair growth, this testimony is directly contradicted by Ms. Vermillion's admission that once she read the package's warnings, she told Candy that she had improperly applied the 2 Steps 2 Straight product.

All other evidence in the record supports the conclusion that the straightener was applied to the Plaintiff's relaxed hair. Indeed, Ms. Mason, the salon manager, reached that very conclusion, noting in the Service Record – a regular business record maintained by the Defendant – that the Plaintiff's hair "[d]id not tolerate 'THIO,'" that is, the ammonium thioglycolate in 2 Steps 2 Straight. Further, Ms. Ford, the stylist who treated the Plaintiff's hair after her dramatic hair loss began, plainly told the Plaintiff that her hair loss was caused by a mixing of these chemicals.

Finally, the evidence concerning the condition of the Plaintiff's hair before and after the Plaintiff's November 11, 2005 hair appointment clearly supports the conclusion that the straightener was improperly applied to the Plaintiff's relaxed hair. The Defendant's Service Record documents establish that prior to November 11, 2005 the Plaintiff had only minor hair breakage due to the use of the relaxer. Indeed, this breakage required no treatment other than Ms. Vermillion trimming the hair on the crown of the Plaintiff's head to a length of four inches. There is no indication in the Service Record, however, that the Plaintiff suffered or was developing baldness at any time prior to November 11, 2005. In contrast, after 2 Steps 2 Straight was improperly applied to her hair, the Plaintiff suffered dramatic hair loss which both Ms. Ford and Dr. Wilborn described as being nearly "completely bald" on the crown of her head.

In short, in the face of admissions by the Defendant's manager and another employee that Ms. Vermillion had improperly applied the straightener to the Plaintiff's relaxed hair and the uncontroverted evidence concerning the dramatic change in the condition in the Plaintiff's hair after the straightener treatment, Ms. Vermillion's self-contradicted testimony is insufficient to create an issue of material fact.

Having determined that the facts taken in the light most favorable to the Defendant establish that Ms. Vermillion did improperly apply the ammonium thioglycolate product to the Plaintiff's relaxed hair, the remaining issue is whether that treatment amounted to actionable negligence. In order to prevail at this point in the proceedings, the Plaintiff must establish initially that there is no material issue as to whether the Defendant "failed to exercise proper care in the performance of a duty owed to" the Plaintiff, see Rose, 104 N.C.App. at 541, 410 S.E.2d at 222, which in the case of a cosmetologist would include a failure to "exercise reasonable care and diligence in the

11

application of her knowledge and skill to her client's case." Johnson, 273 N.C. at 708, 161 S.E.2d at 138. As discussed above, Ms. Vermillion has admitted that on November 11, 2005, and based on her training and experience, she knew that an ammonium thioglycolate straightener could not be applied to hair that had been previously treated with a sodium hydroxide-based relaxer and that such a misapplication could cause the type of hair breakage and loss that the Plaintiff subsequently experienced. Ms. Vermillion was well aware that the Plaintiff's hair already had been treated with Mizani, which contained sodium hydroxide, because Ms. Vermillion had applied the relaxer herself. Ms. Vermillion has also admitted that she did not read the contents, instructions or warnings on the 2 Steps 2 Straight package.

In other words, despite generally being aware of the risk of combining ammonium thioglycolate and sodium hydroxide, of the presence of sodium hydroxide in the Plaintiff's hair, and of the presence of ammonium thioglycolate in some straighteners, Ms. Vermillion elected to apply 2 Steps 2 Straight without first determining the contents of that straightener. As she later admitted to Candy, and as Ms. Mason and Ms. Ford also concluded, this course of treatment resulted in a harmful misapplication of the straightener that would have been avoided if Ms. Vermillion had read the product warnings. The undersigned concludes that confronted with these facts, a jury would be unable to find that Ms. Vermillion had exercised "reasonable care and diligence" in her treatment of the Plaintiff's hair, and accordingly, that the Plaintiff has met its burden concerning the first element of her negligence claim.

The remaining elements of the Plaintiff's claim concern causation, that is, the Plaintiff must show that there is no material issue as to whether Ms. Vermillion's negligence "was a proximate cause of [the P]laintiff's injury; and [whether] a person of ordinary prudence should have foreseen

that [the P]laintiff's injury was probable under the circumstances as they existed." Rose, 104 N.C.App. at 541, 410 S.E.2d at 222. The North Carolina Supreme Court has explained that the test for both proximate cause and foreseeability "is whether the risk of injury, not necessarily in the precise form in which it actually occurs, is within the reasonable foresight of the defendant." Martishius v. Carolco Studio, 355 N.C. 465, 479, 562 S.E.2d 887, 896 (2002). Accord Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984); Williams v. Carolina Power & Light Co., 296 N.C. 400, 403, 250 S.E.2d 255, 258 (1979); and Davis v. Carolina Power & Light Co., 238 N.C. 106, 76 S.E.2d 378 (1953).

The evidence taken in the light most favorable to the Defendant establishes that the risk of hair loss from the application of ammonium thioglycolate to hair relaxed with sodium hydroxide was well known and reasonably foreseeable, even if the exact extent and form of the injury was not certain or guaranteed. As an initial matter, the presence of the express warning on the 2 Step 2 Straight packaging, and Ms. Vermillion's admission that she was aware that a misapplication could cause the customer's hair to break and fall out, are substantial evidence on this point.

The Defendant argues that Dr. Slaughter's initial diagnosis that the Plaintiff suffered folliculitis and alopecia – chronic conditions that might or might not have been caused by the combination of ammonium thioglycolate and sodium hydroxide – is sufficient to create an issue of material fact as to causation. A review of the entire record shows, however, that there is no material issue as to the causation of the Plaintiff's dramatic hair loss. As discussed above, although the Plaintiff had experienced some hair breakage prior to Ms. Vermillion's application of the straightener, it was immediately after that hair appointment that the Plaintiff lost hair at such a rate that she was described by Ms. Ford and Dr. Wilborn as appearing to be nearly "completely bald."

Moreover, at his deposition, Dr. Slaughter explained that he was initially unable to diagnose a direct causal relationship between the Plaintiff's hair treatments and hair loss because the Plaintiff could not tell him at that time what chemicals had been applied to her hair and he had no first hand knowledge of the condition of her hair prior to the treatment she received on November 11, 2005.

At his deposition, however, taken after these formerly unknown facts had been established through discovery, Dr. Slaughter testified that hair treated with sodium hydroxide was easily damaged when also treated with ammonium thioglycolate, specifically that such a combination of treatments "fractionate the cuticle ... [and] cause disruptive damage to the follicle itself." When asked if the focal hair loss pattern he had observed on the Plaintiff – on the crown and some other spots on the sides – was consistent with the consequence of a stylist putting ammonium thioglycolate on Plaintiff's hair after it had been treated with sodium hydroxide, he responded in the affirmative. Dr. Slaughter further testified that the fact that the Plaintiff's hair grew back in six months was "very significant" clinically in establishing that she did not have chronic hair loss, as he initially had opined, rather, had suffered a temporary reaction to a topical solution.

Dr. Wilborn, who conducted a more detailed examination than had Dr. Slaughter, testified that he examined the Plaintiff's hair by a "pull test" and found it was breaking off on the shaft rather than falling out at the root. When Dr. Wilborn examined the Plaintiff's scalp with a dermatoscope, he counted a "normal" number of hairs emerging from the skin. He further testified that "[t]here was no evidence of hair loss from the scalp, only from hair that had already emerged from the scalp that broke off." Dr. Wilborn saw the Plaintiff a second time in February 2008 and found that her hair was not breaking and that her scalp was healthy, which he opined was further evidence that her

condition in December 2005 was caused by the application of ammonium thioglycolate to hair that had previously been treated with sodium hydroxide.

Finally, as to causation the Defendant has speculated in its briefs that the Plaintiff's hair loss could have been caused by her thyroid condition or from suffering anemia. Dr. Slaughter and Dr. Wilborn rejected these theories, however, explaining that any hair loss caused by those conditions would be hair loss at the root rather than hair breaking off in the shaft, and as discussed above, all evidence in the record indicates that the Plaintiff's hair loss was due to breakage.

In sum, even taking the evidence in the light most favorable the Defendant, the Plaintiff has met her burden as to causation as well. Accordingly, the undersigned will grant the Plaintiff's Motion for Partial Summary Judgment and set this matter for trial on the remaining issue of damages.

### III. ORDER

**NOW THEREFORE, IT IS ORDERED:**

1. The Plaintiff's "Motion for Partial Summary Judgment" (document #20) is **GRANTED** as to the Defendant's liability on the Plaintiff's negligence claim.

2. **The Clerk is directed to place this matter on the calendar for trial during the Court's February 2, 2009 Civil Jury Term for a trial on the issue of damages**.

3. Counsel for the parties are encouraged to explore settlement in light of the Court's rulings herein, and to consider whether returning to the previously-ordered mediation might be advisable. Provided, however, counsel are advised that the Court intends to try this case during its February

Term and therefore any efforts to settle their differences in the interim should be promptly commenced.

    4.   The Clerk is further directed to send copies of this Memorandum and Order to counsel for the parties; and to Sarah J. Kromer (previously appointed to mediate this case, which mediation to date has resulted in impasse).

**SO ORDERED, ADJUDGED, AND DECREED**.

    Signed: October 29, 2008

*/s/ Carl Horn, III*

Carl Horn, III
United States Magistrate Judge